Neil **FOLMER,** Petitioner

v.

**WORKERS' COMPENSATION APPEAL BOARD (SWIFT TRANSPORTATION), Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 7, 2008.

Decided Oct. 22, 2008.

---

Nariman P. Dastur, Pittsburgh, for petitioner.

Dale A. Cable, Pittsburgh, for respondent.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Neil Folmer (Claimant) petitions for review of an adjudication of the Workers' Compensation Appeal Board (Board) terminating his benefits. In doing so, the Board affirmed the decision of the Workers' Compensation Judge (WCJ) that Swift Transportation, Inc. (Employer) proved by competent medical evidence that Claimant was completely recovered from his work-related injury. Indeed, the WCJ found that Claimant was a malingerer who magnified symptoms that could not be corroborated by objective medical evidence. In this appeal, we are asked to consider, *inter*

*alia,* how an employer proves a change in a claimant's physical condition, where the claimant's work-related injury consists primarily of pain and dizziness.

On October 23, 1995, Claimant, a truck driver, sustained a work-related injury when he was hit in the face by a box of crowbars while unloading a truck. Claimant filed a claim petition requesting full disability benefits. On May 15, 1998, the WCJ granted the petition, concluding that Claimant was totally disabled by his work-related injury, which was found to be "positional vertigo," "cervical disc syndrome or cervical myalgia and tension headache."[1] WCJ Decision, 5/15/98, at 12; Finding of Fact 13. The WCJ accepted as credible the opinion of Claimant's treating chiropractor that a March 8, 1996, MRI revealed a small central disc protrusion or herniation at the C4–5 level of the spine. The WCJ also found that Claimant's vertigo was caused by vascular compression of the eighth cranial nerve.[2]

In June 2001, Employer filed a termination petition alleging that Claimant fully recovered from his work-related injury as of May 31, 2001. Employer's medical experts opined that Claimant was fully recovered, and Claimant's medical experts opined to the opposite.

One of Claimant's experts, Joseph Eshleman, D.O., interpreted a 1999 cervical MRI as ruling out a disc herniation at any level or a nerve root impingement. On the other hand, he construed an EMG and nerve conduction study from 1999 to show radiculopathy at the C–6 vertebra. Dr. Eshleman also believed that vestibular testing done on Claimant in January 2000 had increased Claimant's vertigo.[3]

Another of Claimant's experts, Joseph Wapenski, M.D., found that Claimant suffered "some very subtle nystagmus," which is a jerking of the eyes that confirms the presence of vertigo. WCJ Decision, 9/18/03, at 8; Finding of Fact 11. However, Dr. Wapenski found that Claimant's nystagmus, which is objective evidence of vertigo, was not always present; sometimes it appeared and sometimes it did not, depending on the day of the test.

Claimant's last expert, Leslie Tar, M.D., testified that Claimant had taut, ropy bands of muscle in the cervical area, which was objective evidence of cervical myalgia. Because Claimant did not have nerve root impingement, Dr. Tar believed that Claimant's radiculopathy was caused by muscle spasms in the cervical area.

The WCJ denied the termination petition on September 18, 2003. However, the WCJ was troubled that Claimant's medical evidence was stale and that Claimant had not undergone any recent diagnostic testing. The WCJ specifically explained as follows:

> [T]his is a close case to decide although at this time I am willing to give the claimant the benefit of the doubt.... Without more recent diagnostic testing of EMG and nerve conduction studies and/or vestibular testing, I am not persuaded or convinced the claimant has fully recovered from all of his compensable work injuries.... .

---

1. "Cervical disc syndrome" is defined as "pain, paresthesias, and sometimes weakness in the area of the distribution of one or more cervical roots, due to pressure of a protruded cervical intervertebral disc." STEDMAN'S MEDICAL DICTIONARY 1750 (27th ed.2000). "Myalgia" is defined as "muscular pain." *Id.* at 1167.

2. Claimant underwent two bilateral retromastoid craniotomy surgeries for decompression of his eighth cranial nerve in May 1997 and in July 1999.

3. Vestibular testing is done to determine the presence of positional vertigo.

WCJ Decision, 9/18/03, at 12; Finding of Fact 13. This discussion is difficult to follow inasmuch as the stale tests referred to by the WCJ were those of Claimant's medical experts. Further, the EMG referred to by the WCJ pertained to Claimant's C–6 radiculopathy, which was not one of his accepted work injuries, and Claimant's own expert agreed that he did not have a C–6 disc herniation.[4]

On August 9, 2004, Employer filed a second termination petition, which we consider in this appeal. Employer alleged that Claimant had fully recovered as of December 11, 2003, from any residual problem related to his October 23, 1995, work-related injury.

In support of its petition, Employer presented the testimony of Howard J. Senter, M.D., board-certified in neurological surgery, who conducted a thorough examination of Claimant on December 11, 2003. Claimant complained of tunnel vision, hearing loss, dizziness, weakness in his hands, numbness in his hands and arms, neck pain and headaches.[5] Dr. Senter performed a neurologic examination and a mechanical examination, both of which required a battery of tests. Dr. Senter tested Claimant's cranial nerves and vestibular function, which affect balance and coordination. The findings were normal. Claimant exhibited smooth eye movements, i.e., the absence of nystagmus, full visual fields, normal optic nerve, and symmetric face. The tests ruled out positional vertigo; vestibular, cerebellar or balance dysfunction; and any problem with Claimant's eighth cranial nerve. Dr. Senter explained that when nystagmus is due to a problem with the eighth cranial nerve, it should be present all the time and does not come and go, as Claimant's physician, Dr. Wapenski, had described in the prior termination hearing.

Dr. Senter also examined Claimant's neck, which exhibited a normal range of motion. He did not find taut muscles or any evidence of pain or muscle spasms, thereby ruling out C–6 radiculopathy, which was not even a work-related injury. Dr. Senter looked for evidence of neurologic impairment in the nerves or muscles of the upper extremity and found none; Claimant exhibited normal reflexes, strength and sensation in both upper extremities. Dr. Senter reviewed the report of an MRI done on Claimant's neck that did not show a herniated disc but, rather, degenerative disc disease, which was normal for a person of Claimant's age.

Some of Claimant's test results were not normal, but Dr. Senter explained that Claimant was faking the results. Indeed, Dr. Senter testified that he found Claimant was malingering and magnifying his symptoms throughout the examination.[6] We consider only some examples of those false symptoms, as a complete list would be too lengthy.

Although Claimant complained of dizziness, his smooth eye movements ruled out vertigo resulting from a cranial nerve problem or any other source. Claimant responded differently to two different tests that checked for the same hearing functions, making the inconsistent results im-

---

4. According to Claimant's expert, Dr. Tar, the C–6 radiculopathy was caused by muscle spasms.

5. Claimant also complained of shoulder pain, but the WCJ had determined that Claimant's shoulder problem was not work-related in the prior proceeding.

6. Dr. Senter described malingering as "intent to deceive the observer," and symptom magnification as "expansion upon your symptoms and magnifying them in order to convince the observer that something is going on that really isn't." Reproduced Record at 136a.

possible. Claimant demonstrated balance problems during one test and normal balance in another test; again this was impossible because both tests checked the same function but in a different way. Claimant demonstrated normal strength in some muscles and "give away" weakness in other muscles; all the muscles in question, however, were enervated by the same nerve. Muscles enervated by the same nerve will all be weak or all be strong; there can be no combination. Claimant complained of loss of sensation in places that did not make sense because they did not correspond to the way nerves actually run to the muscles. A genuine nerve problem will produce predictable losses of sensation that correspond to the damaged nerve. Based on these and many other inconsistencies in Claimant's test results, Dr. Senter explained that "it is not medically possible for this person to have this combination of neurologic complaints on the basis of any organic disease." Reproduced Record at 136a (R.R. ——).

Dr. Senter opined that Claimant did not suffer from positional vertigo resulting from compression of the eighth cranial nerve, cervical disc syndrome or cervical myalgia. With respect to headaches, Dr. Senter explained that Claimant reported only migraine headaches, which could not be related to the work injury. Accordingly, Dr. Senter opined that Claimant was fully recovered and capable of returning to his prior job without restrictions.

Employer also presented the testimony of John B. Talbott, M.D., board-certified in neurology, who examined Claimant on September 20, 2005. That examination ruled out brain problems, pinched nerves, herniated discs, spinal cord involvement or dizziness. Dr. Talbott testified that there were no objective findings to confirm Claimant's numerous subjective complaints. Dr. Talbott found no evidence of nystagmus to corroborate Claimant's complaints of vertigo. Further, Dr. Talbott stated that although Claimant exhibited symptoms of sensory loss, he did so in an inconsistent fashion and in a way that did not conform to the anatomy of the human spinal cord. Dr. Talbott opined that Claimant was fully recovered from his work-related injuries. In fact, Dr. Talbott believed that Claimant had been fully recovered when he did an earlier evaluation in March 2000.

Claimant testified that he continues to experience headaches, dizziness and tunnel vision. He stated that his condition is "about the same" as the last time he testified before the WCJ. WCJ Decision, 4/27/06, at 2; Finding of Fact 4.

On April 27, 2006, the same WCJ who heard the first termination petition decided, this time, to grant Employer's termination petition. The WCJ explained that

in my last Decision of September 18, 2003, in the [employer's] Termination Petition, I found that it was a close case to decide although at that time, I was willing to give the claimant the benefit of the doubt and found that the [employer] had not met its required burden of proof for a termination of compensation benefits as of May 31, 2001. *I am now convinced that the claimant has symptom magnification and is a malingerer as testified to by Dr. Senter and as corroborated by the testimony of Dr. Talbott.*

WCJ Decision, 4/27/06, at 11; Finding of Fact 17 (emphasis added). The WCJ noted that he himself witnessed the inconsistencies in Claimant's behavior to which Drs. Senter and Talbott had testified. Claimant exhibited balance problems in the presence of the WCJ in the hearing room; however, Claimant walked without any difficulty when he did not know that the WCJ was watching him. The WCJ

rejected Claimant's complaints as not credible. He also rejected the testimony of Claimant's physicians as not credible. The WCJ credited the testimony of Dr. Senter and Dr. Talbott, finding Claimant's subjective complaints to lack any objective basis and to be false. He found Claimant was capable of returning to his prior job without restrictions.

Claimant appealed, and the Board affirmed. In doing so, the Board determined that the credible testimony of Dr. Senter and Dr. Talbott was legally competent and sufficient to support a termination of benefits. In its opinion, the Board referred to *King v. Workmen's Compensation Appeal Board (K–Mart Corp.)*, 549 Pa. 75, 700 A.2d 431 (1997), wherein the Supreme Court held that an employer is not barred by collateral estoppel from filing a second termination petition. The employer has to prove that as of a new date, the claimant's work-related disability has ceased. Claimant then petitioned for this Court's review.[7]

On appeal, Claimant presents two issues for our consideration. First, he argues that *King* has been overruled by *Lewis v. Workers' Compensation Appeal Board (Giles & Ransome, Inc.)*, 591 Pa. 490, 919 A.2d 922 (2007). In *Lewis*, our Supreme Court held that in a second termination proceeding, an employer must show that the claimant's physical condition has changed since the prior denial of a termi-

nation. Claimant argues that Employer did not produce such evidence and, therefore, the Board's decision must be reversed under *Lewis*. Second, Claimant contends that the medical opinions relied upon by the WCJ were incompetent because they failed to address all of Claimant's adjudicated work injuries. In response, Employer contends that the record supports the WCJ's conclusion that Claimant was fully recovered as of December 11, 2003; that there is no objective basis to support Claimant's subjective complaints; and that Employer did, in fact, show a change in Claimant's physical condition from the prior adverse adjudication.[8]

We begin with Claimant's argument pertaining to *Lewis*, wherein our Supreme Court clarified that an employer must show a change in a claimant's condition in order to prevail in a second termination petition. Claimant argues that Employer did not show a change in his physical condition after losing its first termination petition, and this requires the Board to be reversed.

In *Lewis*, the employer filed three petitions to terminate benefits, and each petition was denied by the WCJ. Three days after the Board denied the employer's third termination petition, the employer filed a fourth termination petition again alleging a full recovery. At the hearing on the fourth petition, the employer's medical

---

7. This Court's review is limited to determining whether an error of law or a constitutional violation was committed or whether the findings of fact are supported by substantial, competent evidence. *Myers v. Workers' Compensation Appeal Board (University of Pennsylvania and Alexsis, Inc.)*, 782 A.2d 1108, 1110 n. 1 (Pa.Cmwlth.2001).

8. This case was scheduled for argument before the Court *en banc* in order for the parties to address whether *Lewis* should be applied prospectively or retroactively and how an employer can show a change in condition when

a prior termination was denied on the basis of the claimant's subjective complaints. At argument, Claimant asserted that *Lewis* is not a change in the law because it overruled *King*, which had been an "anomaly" decision that was not generally followed. Claimant contended that *Lewis* is representative of the overall state of the law and requested that this Court not remand the case. Employer maintained that it satisfied its burden of showing a change in condition and that it should prevail under either *King* or *Lewis*.

expert opined that the claimant's work-related injuries were limited to an acute cervical sprain and acute lumbosacral strain, both of which had resolved, and that the claimant's current medical conditions were unrelated to the work injury. Crediting the employer's expert, the WCJ granted the employer's fourth termination petition. The Board and this Court affirmed. The Supreme Court then granted review to consider

> whether an employer must demonstrate a change in a claimant's physical condition since the preceding disability adjudication in order to bring a petition to terminate or modify benefits due to a decrease in physical disability.

*Lewis*, 591 Pa. at 495, 919 A.2d at 925.

Relying on Section 413 of the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 772,[9] and *Kachinski v. Workmen's Compensation Appeal Board (Vepco Construction Co.)*, 516 Pa. 240, 532 A.2d 374 (1987), the Supreme Court held that an employer must present medical evidence that the claimant's current physical condition has changed from what it was in the previous termination proceeding.[10] *Lewis*, at 501, 919 A.2d at 928. The Supreme Court defined "change of condition" as "any change in the claimant's physical well being that affects his ability to work." *Id.* at 497, 919 A.2d at 926.

Faced with an employer that filed serial termination petitions, the Supreme Court in *Lewis* was concerned that such an employer would recharacterize or disregard the prior adjudicated facts in these serial petitions in order to realize a favorable outcome. It goes without saying that an employer may not, for example, present expert testimony that a claimant's condition, which is unchanged, is not actually work-related as previously adjudicated. Rather, the employer must accept the adjudicated condition and prove recovery from it at a later date; this is what is meant by showing a physical change of condition.

■ Here, Claimant's disability was adjudicated to be "positional vertigo," "cervical disc syndrome or cervical myalgia, and tension headaches." WCJ Decision, 5/15/98 at 12; Finding of Fact 13. In the first termination proceeding, Employer tried to prove that as of May 31, 2001, Claimant was completely recovered. Employer failed because the WCJ credited Claimant's subjective complaints of pain and difficulty. To prevail in its second termination proceeding, Employer had to present medical evidence to show that after May 31, 2001, Claimant's condition changed. Stated otherwise, Employer's

---

9. Section 413 provides in relevant part:

> A workers' compensation judge designated by the department may, at any time, modify, reinstate, suspend, or terminate a notice of compensation payable, an original or supplemental agreement or an award of the department or its workers' compensation judge, upon petition filed by either party with the department, upon proof that the disability of an injured employe has increased, decreased, recurred, or has temporarily or finally ceased, or that the status of any dependent has changed.
>
> 77 P.S. § 772.

10. In *Kachinski*, the Pennsylvania Supreme Court outlined a four-part test that must be employed in order for an employer to modify workers' compensation benefits. The first part of the test states: *"The employer* who seeks to modify a claimant's benefits on the basis that he has recovered some or all of this ability *must first produce medical evidence of a change in condition." Id.* at 252, 532 A.2d at 380 (emphasis added). Therefore, where an employer seeks to modify or terminate benefits because the claimant's medical condition has improved, the employer bears the burden of demonstrating actual physical improvement. *Lewis*, 591 Pa. at 497, 919 A.2d at 926.

case had to begin with the adjudicated facts found by the WCJ in the first termination petition and work forward in time to show the required change. *Lewis,* 591 Pa. at 501, 503, 919 A.2d at 928–929. *See also Taylor v. Workers' Compensation Appeal Board (Servistar Corp.),* 883 A.2d 710, 713 (Pa.Cmwlth.2005) (citation omitted) (explaining that where a claimant seeks a reinstatement after a termination of benefits, he must prove that his disability has increased or recurred and that his physical condition has actually changed "since the prior decision.")

Both Drs. Senter and Talbott, who examined Claimant in 2003 and 2005 respectively, testified that Claimant's complaints were either false or not related to his work injury, *i.e.,* the migraine headaches. Dr. Senter described in detail the battery of physical tests he performed on Claimant after the first adjudication, and none corroborated Claimant's complaints. They did, however, confirm malingering. In the prior litigation, the objective findings of mild nystagmus and taut neck muscles supported Claimant's subjective complaints. Dr. Senter and Dr. Talbott did not find any nystagmus, and they found Claimant's neck muscles to be normal, not taut. Accordingly, Employer presented medical evidence that showed a "change in the claimant's physical well being that affects his ability to work." *Lewis,* 591 Pa. at 497, 919 A.2d at 926. Any other holding

would mean that an employer could never terminate benefits where, as here, the claimant's injuries consist primarily of subjective complaints, and the credited evidence shows that the claimant is faking.[11]

According to Claimant, however, where a claimant's injuries consist of symptoms that do not have objective support, the employer's ability to show a change in the claimant's condition is limited. Claimant suggests that the employer can show change only with evidence that the claimant no longer had complaints; the claimant discontinued medical treatment; the claimant's own doctor believed he recovered; or surveillance videotapes showed the claimant engaging in activities beyond his abilities given his work injury. Essentially, under Claimant's paradigm an employer will not be able to show a cessation of pain unless the claimant himself acknowledges this cessation.

We reject Claimant's proposed paradigm. Because every case presents a different factual scenario, the evidence needed to show a change of condition will be different in each case. Further, nothing in the Workers' Compensation Act supports Claimant's proposed paradigm. To the contrary, Claimant's proposal would impinge upon the province of the WCJ, who has the statutory responsibility to consider the evidence; determine which evidence is credible; and decide which evidence is entitled to the greatest weight.[12]

---

11. Employer's evidentiary case did not violate the concern voiced by the Supreme Court that "a disgruntled employer ... could repeatedly attack what he considers an erroneous decision of a[WCJ] by filing petitions based on the same evidence *ad infinitum,* in the hope that one [WCJ] would finally decide in his favor." *Lewis,* at 497–498, 919 A.2d at 926, (citation omitted). Madame Justice Baldwin's well-reasoned concurring opinion in *Lewis* suggested that *Lewis* was too broad in scope, but *Lewis* was not intended to allow claimants

who manufacture symptoms to remain on workers' compensation disability indefinitely.

12. Claimant further suggests that because "diagnostic tests" done by his experts corroborated some of Claimant's complaints in the prior proceeding, Employer was required to do its own diagnostic tests. We disagree. In this proceeding, the WCJ rejected the vestibular testing of Claimant's expert because such tests can yield false positives and the outcome can be manipulated by the patient. Diagnostic test results are not infallible and, what is

■ Essentially, this case boils down to the WCJ's credibility determinations. The WCJ rejected Claimant's evidence and accepted, instead, the medical evidence presented by Employer.[13] Employer established to the satisfaction of the WCJ that Claimant was fully recovered. In the first termination proceeding Claimant was found to be suffering pain, and in the second proceeding he was found to be free of pain. This constitutes a change in physical condition, as required by *Lewis*.[14]

Indeed *Lewis's* author, Justice Ralph J. Cappy, has said as much. In his concurring opinion in *King*, 549 Pa. 75, 700 A.2d 431, where the employer obtained a termination by proving a change in claimant's condition,[15] Justice Cappy explained:

> [The employer] offered a change in condition since the 1983 termination petition

proceedings by presenting expert medical testimony of the 1989 examination of [the claimant] *and the expert's conclusion that [the claimant's] subjective complaints of pain, at the time of the second examination, were unfounded. Thus, the Act's requirement of proving a change in condition since the last determination regarding the extent of the claimant's injury was met.*

*Id.* at 83, 700 A.2d at 436 (Cappy, J., concurring) (emphasis added). This is precisely what happened here: the testimony of Employer's experts established that Claimant's "subjective complaints of pain" were unfounded.

■ Claimant's second argument is that Employer failed to meet its burden of proof for a termination [16] because its medi-

---

more, diagnostic test results can be interpreted in different ways by different doctors. Claimant was subjected to a battery of clinical physical tests to all areas involved in his work injury, and they did not reveal the continued presence of any one of the work-related injuries.

13. In assessing the evidence, the WCJ is the ultimate fact-finder and has complete authority over questions of credibility and evidentiary weight. *Davis v. Workers' Compensation Appeal Board (City of Philadelphia)*, 753 A.2d 905, 909 (Pa.Cmwlth.2000). The WCJ is free to accept, in whole or in part, the testimony of any witness, including medical witnesses. *Greenwich Collieries v. Workmen's Compensation Appeal Board (Buck)*, 664 A.2d 703, 706 (Pa.Cmwlth.1995).

14. The dissent seems to suggest that a change in physical condition can be shown only by a diagnostic test, which, in the parlance of workers' compensation jurisprudence, is a test done by a technician, such as an x-ray or MRI. There are several problems with that suggestion. First, it is for medical experts to determine what tests, whether "pictures" or patient-response type clinical tests, are appropriate to demonstrate change. Second, no test is infallible. An x-ray and MRI must be interpreted by medical experts, and such ex-

perts often disagree on the correct interpretation. Likewise, as the WCJ recognized, vestibular testing can be controlled by a patient and yield false positives. In short, there are an array of studies and tests which a medical expert will use to develop his expert opinion. It is not the job of courts to dictate which tests experts should undertake. The dissent notes that Dr. Wapenski found "very mild" nystagmus, but Dr. Wapenski was not found credible by the WCJ. Although not one of Claimant's experts was found to be credible, the dissent discusses their testimony at some length.

15. There, the claimant suffered from "chronic coccydynia," which is pain in the tail bone area, and the employer's medical expert found no cause for the claimant's pain complaints. This opinion was rejected. Employer had the claimant examined again in 1989 and again the doctor found no objective basis to explain the subjective pain complaints. The WCJ accepted this opinion and granted the second termination petition.

16. In a termination proceeding, the employer bears the burden of proving that the claimant fully recovered from his work injury and has no remaining disability, or that any remaining disability is no longer related to the work injury. *Campbell v. Workers' Compensation*

cal experts did not acknowledge the accepted work injuries and attempted to relitigate the issue of what is included in the work injury. Specifically, Claimant contends that Dr. Senter's testimony was incompetent because he did not opine that Claimant's headaches do not exist. Further, Claimant notes that Dr. Senter's opinion as to what the 1996 MRI showed, *i.e.*, a normal cervical spine for a person of Claimant's age, was contradicted by Claimant's doctor. Claimant then points out that Dr. Talbott stated he was unsure that the 1996 cervical MRI findings related to the work incident. Claimant also points to Dr. Talbott's belief that Claimant's cranial nerves were not damaged in the work incident even though the WCJ found a compression at the eighth cranial nerve caused Claimant's vertigo in the 1998 claim petition. Finally, Claimant notes that Dr. Talbott believed that Claimant was fully recovered in March 2000, which "flies in the face of the WCJ's September 18, 2003, determination" that Claimant was not fully recovered. These points, according to Claimant, render both of Employer's experts incompetent.

In support of his argument, Claimant cites to *GA & FC Wagman, Inc. v. Workers' Compensation Appeal Board (Auckner)*, 785 A.2d 1087 (Pa.Cmwlth.2001) and *Gillyard v. Workers' Compensation Appeal Board (Pennsylvania Liquor Control Board)*, 865 A.2d 991 (Pa.Cmwlth.2005). In *Wagman*, the employer's medical expert failed to testify that the claimant was fully recovered from exacerbation of pseudoarthrosis, which was the accepted work injury. In *Gillyard*, the employer's doctor believed that the work injury was only a lumbar strain/sprain when in reality the work injury also included chronic sciatica with disc bulging. The employer's doctor specifically testified that he was not opining that the claimant was recovered from anything other than the lumbar strain/sprain. In both cases, the testimony of the employers' medical experts was deemed insufficient to support a termination because the testimony did not address the work-related injury.

However, this is not a *Wagman* or *Gillyard* case. This case is more akin to *To v. Workers' Compensation Appeal Board (Insaco, Inc.)*, 819 A.2d 1222 (Pa.Cmwlth. 2003), in which the IME doctor was unable to see, based on the claimant's complaints and description of the mechanism of injury, how a work injury could have occurred. Nevertheless, the employer's doctor testified that there was no connection between the claimant's current complaints and the work incident and no evidence of medical impairment, and therefore, the claimant had fully recovered from any work injury he may have sustained. This Court agreed with the WCJ and the Board that the testimony was competent and supported a finding of full recovery. *Id.* at 1225.

Dr. Senter and Dr. Talbott did not refuse to acknowledge or to address Claimant's work injury. To the contrary, they addressed each adjudicated injury as well as every observation made by Claimant's medical experts in the first termination proceeding, even those that went beyond Claimant's accepted work injuries.

Claimant's adjudicated work injury is "positional vertigo," "cervical disc syn-

---

*Appeal Board (Antietam Valley Animal Hospital)*, 705 A.2d 503, 506–507 (Pa.Cmwlth. 1998). A termination of benefits is proper where a medical expert credibly testifies that the claimant fully recovered from his work injury and can return to work without restric-

tions, and that there are no objective medical findings that either substantiate claims of pain or connect them to the work injury. *Udvari v. Workmen's Compensation Appeal Board (USAir, Inc.)*, 550 Pa. 319, 327, 705 A.2d 1290, 1293 (1997).

drome or cervical myalgia, and tension headache." WCJ Decision, 5/15/98 at 12, Finding of Fact 13; WCJ Decision, 4/27/06 at 1, Finding of Fact 3. Dr. Senter specifically checked to see if Claimant continued to suffer from positional vertigo as a result of cranial nerve compression, cervical disc syndrome or cervical myalgia, and he opined that Claimant did not have any such mechanical or neurological impairment.

With respect to Claimant's 1996 cervical MRI, Claimant misapprehends the importance of that test. First, the WCJ never found that Claimant's work injury was a herniated disc, and Claimant's own expert, Dr. Eshelman, testified that none existed as of 1999. Accordingly, whether the 1996 cervical MRI showed a herniation or degenerative disc disease is of no moment. Second, it is not clear whether Dr. Senter reviewed the results of the 1996 MRI or a 1999 MRI. It does not matter because Dr. Senter specifically examined Claimant for a cervical disc problem and found none to exist. Employer was required to show a change from the last termination adjudication, and that proceeding established that Claimant did not have a disc herniation.

With respect to headaches, Claimant correctly points out that Dr. Senter stated, "I have no way of knowing that the patient doesn't have a headache." R.R. 146a. Dr. Senter acknowledged that Claimant could have suffered post-traumatic or tension headaches after being struck in the head with a box of crowbars. However, Claimant did not report tension headaches to Dr. Senter but only migraine headaches, for which he was on medication. Dr. Senter explained that Claimant's migraines could not be related to the work injury. Dr. Senter's opinion on Claimant's headaches

as of the date of his examination was sufficient to support a termination. What is more, all of Claimant's complaints were rejected as not credible by the WCJ.

■ With respect to Dr. Talbott, Claimant correctly notes that he was unsure of the cause of the findings on the 1996 MRI; however, we have already explained that the 1996 MRI is irrelevant because the 1999 MRI showed that Claimant did not have any disc herniation. Claimant is also correct that Dr. Talbott did not believe Claimant damaged any of his cranial nerves in the work incident. In the 1998 claim proceeding, the WCJ found, as fact, that cranial nerve compression caused Claimant's positional vertigo, and thereafter Claimant was treated surgically for cranial nerve compression.[17] It is irrelevant whether Dr. Talbott actually believed Claimant ever damaged his eighth cranial nerve. A medical professional is not required to believe a condition existed; he is merely required to accept as true the adjudicated fact that a condition existed and opine as to whether the condition continues to exist at the time of the examination. *To,* 819 A.2d 1222. Dr. Talbott tested Claimant for positional vertigo resulting from compression of the eighth cranial nerve and did not find it. Indeed, he testified that Claimant complained about neurological problems in ways that were anatomically impossible. Finally, although Dr. Talbott believed Claimant had been fully recovered in 2000, there is no evidence that he disregarded the WCJ's adjudicated facts in the first termination petition, *i.e.,* that Claimant continued to be disabled by his work-related injuries. Dr. Talbott examined Claimant in 2005 and

17. The treatment must have been successful because neither Dr. Senter nor Dr. Talbott found any evidence of vertigo.

gave his opinion of his condition as of that date.[18]

In sum, Dr. Senter and Dr. Talbott acknowledged each and every one of Claimant's adjudicated work-related injuries, and each testified that Claimant was fully recovered. They also demonstrated that Claimant's alleged symptoms lacked any objective basis. Their testimony, which was credited by the WCJ, was fully competent to meet Employer's burden of proof for a termination of benefits.

For these reasons, the Board's order is affirmed.

### ORDER

AND NOW, this 22nd day of October, 2008, the order of the Workers' Compensation Appeal Board dated February 28, 2007, in the above-captioned matter is hereby AFFIRMED.

DISSENTING OPINION BY Judge McGINLEY.

I must respectfully dissent.

I believe the majority is modifying the Supreme Court's pronouncement with respect to the Employer's burden on a termination petition. According to the majority, an Employer is no longer required to *prove* a change in physical condition. An employer may now meet its burden on a termination petition by simply presenting an expert's opinion that the employee was faking. I submit this is no different than unsubstantiated expert testimony that a claimant's work injury has resolved and it

is insufficient, in and of itself, to establish a change in physical condition.

According to our Supreme Court, expert medical testimony that a work injury has resolved, without showing that a claimant's physical condition has changed, is insufficient to terminate benefits. *Lewis v. Workers' Compensation Appeal Board (Giles & Ransome, Inc.)*, 591 Pa. 490, 919 A.2d 922 (2007).[1] By the same token, a doctor's testimony that a claimant is faking, without *medical proof* that his physical condition has changed, is not sufficient to support a termination of benefits.

Here, the WCJ's decision to terminate benefits was based on his acceptance of Dr. Senter's and Dr. Talbot's *belief* that Claimant was faking his symptoms. However, Employer failed to establish that Claimant's actual physical condition changed.

Claimant sustained extensive injuries on October 23, 1995, while he unloaded boxes from Employer's truck. As he looked up, a box of crowbars fell approximately 2–3 feet striking him in the face and head, breaking his teeth and knocking him to his knees.

On May 8, 1997, Claimant underwent a right-sided retromastoid craniectomy at the University of Pittsburgh Medical Center to relieve severe compression of his eighth cranial nerve.[2]

### 1. Claimant's Claim Petition and Established Work Injury

On May 15, 1998, the WCJ granted Claimant's claim petition and defined the

---

18. In any case, Dr. Senter's testimony alone supports the WCJ's finding that Claimant was recovered.

1. Where there have been prior petitions to modify or terminate benefits the employer must demonstrate a change in physical condition since the last disability determination. Absent this requirement a disgruntled employer could repeatedly attack what he con-siders an erroneous decision of a referee by filing petitions based on the same evidence ad infinitum, in the hope that one referee would finally decide in his favor. *Banks v. WCAB*, 15 Pa.Cmwlth. 373, 327 A.2d 404, 406 (1974).

2. The eighth cranial nerve effects balance and hearing.

accepted work injury as "disabling positional vertigo as a result of a vascular compression of his balance and hearing nerves at the eighth cranial nerve" as well as injuries of "cervical disc syndrome or cervical myalgia and tension headaches." WCJ Decision, May 15, 1998, at 12.

On July 1, 1999, Claimant underwent a second decompression of the left eighth cranial nerve in an attempt to alleviate his ongoing complaints of disabling positional vertigo and tinnitus.

### 2. Employer's Utilization Review Petition

On January 28, 2000, Employer filed a Utilization Review Petition, and challenged the causation of the second subsequent cranial nerve surgery and the reasonableness and necessity of Claimant's weekly treatments with a chiropractor. On April 5, 1999, Claimant filed a Petition to Review Medical Treatment. The petitions were consolidated and hearings were held before the WCJ from May 1999 through July 2000.

Claimant presented the medical reports of Dr. Billot, Dr. Jannetta, Joseph M. Furman, M.D., Joseph A. Wapenski, M.D., Joseph K. Eshelman, D.O, all of whom opined that Claimant's chronic neck pain, headaches, and disequilibrium and the respective treatments were related to the accident.

Employer presented the medical report of John M. Talbot, M.D. who performed an IME of Claimant and reviewed medical records. Dr. Talbot opined that he could not find any convincing objective findings to indicate Claimant had any disability that could be attributed to the October 23, 1995, accident.[3]

The WCJ rejected Dr. Talbot's testimony and accepted the testimony of Claimant's medical experts. The WCJ granted Claimant's Petition to Review Medical Treatment, denied Employer's Utilization Review Petition and directed Employer to continue to pay all reasonable and necessary and causally related medical bills including the chiropractor bills and the bills for the surgery.

### 3. Employer's First Termination Petition

Four months later, on June 11, 2001, Employer filed its first Termination Petition based on the opinion of Dr. Vertosick who had opined that Claimant recovered from all of his work injuries.

Claimant presented the deposition of Dr. Eshelman who treated Claimant since March 8, 1999, for his neck pain. Electrodiagnostic testing revealed an injury to the nerve at the right C6 which Dr. Eshelman believed was caused when the box full of crowbars came down on Claimant's head and face and forced his neck backwards, narrowing his nerve openings. Dr. Eshelman also noted that Claimant had vestibular testing in January 2000, which caused an increase in his vertigo and marked nausea and vomiting.[4]

Dr. Wapenski also testified by deposition on behalf of Claimant. Dr. Wapenski treated Claimant for his headaches. Dr. Wapenski noted an asymmetric nystagmus during some of Claimant's visits which, in laymen's terms, is a jerking movement of the eyes, on the left lateral gaze. According to Dr. Wapenski, the nystagmus that fluctuated during the course of Claimant's treatments led him to believe that Claimant had an equilibrium problem.[5]

---

**3.** *See* WCJ Decision, February 14, 2001, F.F. No. 20 at 7–8.

**4.** *See* WCJ Decision, September 18, 2003, F.F. No. 10 at 5–6.

**5.** *See* WCJ Decision, September 18, 2003, F.F.

On September 18, 2003, the WCJ denied the Termination Petition *because **no diagnostic tests, such as vestibular testing, had been done since January of 2000,*** and the WCJ was not persuaded that Claimant had fully recovered from all of his compensable work injuries which included "cervical disc syndrome, or cervical myalgia, tension headache, positional vertigo and/or disequilibrium." WCJ Decision, September 18, 2003, at 12.

### 4. Employer's Second Termination Petition

On August 9, 2004, Employer filed a second Termination Petition which is the basis of this appeal. This time, Employer's Termination Petition was based on the opinions of Howard Senter, M.D. in addition to Dr. Talbot.

Dr. Senter performed an IME on December 11, 2003, which was limited to a physical examination of Claimant at his office. Despite the WCJ's explicit concern about the lack of updated diagnostic tests, such as vestibular testing, to confirm whether Claimant's injuries had resolved, Dr. Senter did not review any recent MRI's, he did not conduct any diagnostic tests, he did not review any updated diagnostic tests. He merely reviewed the 1996 MRI report which established, in his opinion, a degenerative disc disease which was "normal" for a person of Claimant's age. Dr. Senter Deposition at 29, 51; R.R. at 144a, 166a.[6] With respect to headaches, Dr. Senter explained that Claimant reported that he suffered from migraine headaches which Dr. Senter did not believe were related to the work injury. Dr. Senter believed Claimant tried to "deceive" him because Claimant's responses to his

neurological and mechanical examinations were "inconsistent" and that it was not "medically possible for this person to have this combination of neurologic complaints on the basis of any organic disease." Dr. Senter Deposition at 21; R.R. at 136a. Without performing or reviewing any diagnostic tests which could have confirmed Claimant's positional vertigo, Dr. Senter testified that Claimant "had no abnormality that I could detect" and that the abnormalities that Claimant manifested were "abnormalities of clear-cut malingering and faking his exam." Dr. Senter Deposition at 22; R.R. at 137a.

In contrast, Claimant's experts performed diagnostic tests which produced objective results that could not be faked. Claimant presented the deposition testimony of Joseph M. Furman, M.D., board-certified in psychiatry and neurology. Dr. Furman performed a battery of vestibular laboratory tests on Claimant on May 16, 2005, including a thermal stimulation test and rotational stimulation test, the results of which were abnormal. Dr. Furman explained that the combination of "reduction of sensitivity on one side as compared to another and [the] motion abnormality . . . means the brain is not taking the signals in from the two inner ears and processing them properly." Deposition of Joseph M. Furman, M.D., July 22, 2005, at 7, 1–14; R.R. at 296a, 301a–303a. Dr. Furman explained that the patient was unable to influence the tests and that "the patient has almost no control whatsoever over the response and certainly can't reduce the responses on one side compared to the other." Dr. Furman Deposition at 13–14; R.R. at 302a–303a. Dr. Furman opined that the cause of Claimant's balance disor-

No. 11 at 8.

**6.** Again, the 1996 MRI had shown the disc protrusion at C4–C5 and supported the WCJ's

original finding of "cervical disc syndrome" on the Claim Petition.

der was caused by the 1995 head trauma. Dr. Furman Deposition at 19; R.R. at 308a. On cross exam, Dr. Furman acknowledged that the tests may have false positives, but in his opinion the likelihood that Claimant's tests resulted in a "false positive" was "very, very low" and "unlikely". Dr. Furman Deposition at 22; R.R. at 311a.

Claimant also presented the testimony of Mark R. Foster, M.D., board-certified in orthopedic surgery, who treated Claimant as recently as March 15, 2005. At that time, Claimant complained of headaches, migraines, and neck pain. Dr. Foster ordered an MRI of Claimant's neck on September 23, 2004, which showed "narrowing of the neural foramen at C5–6 and a bulging disk and compression of the left C6 root in the left foramen that couldn't be excluded." Deposition of Mark R. Foster, M.D., April 19, 2005, at 12; R.R. at 215a. Claimant also had an EMG on September 24, 2004, which showed a "chronic radiculopathy, C5–6 on the right and a left chronic radiculopathy at C6–7." *Id.* Dr. Foster believed Claimant's symptoms were directly related to his accident and he recommended an anterior cervical fusion at C5–6. Dr. Foster Deposition at 15; R.R. at 218a.

On April 27, 2006, the WCJ granted Employer's Termination Petition.

In *Lewis,* our Supreme Court held that where there have been prior petitions to modify or terminate benefits, the employer seeking modification or termination of benefits *must demonstrate by medical proof a change in physical condition* since the last disability determination, overruling *King:*

> **In order to terminate benefits on the theory that a claimant's disability has reduced or ceased due to an improvement of physical ability, it is first necessary that the employer's petition be based upon medical proof of a change in the claimant's physical condition.** Only then can the workers' compensation judge determine whether the change in physical condition has effectuated a change in the claimant's disability, i.e., the loss of his earning power. Further, by natural extension it is necessary that, **where there have been prior petitions to modify or terminate benefits, the employer must demonstrate a change in physical condition since the last disability determination.** Absent this requirement "a disgruntled employer (or claimant) could repeatedly attack what he considers an erroneous decision of a referee by filing petitions based on the same evidence ad infinitum, in the hope that one referee would finally decide in his favor." *Dillon,* 640 A.2d at 389, quoting *Banks v. WCAB,* 15 Pa.Cmwlth. 373, 327 A.2d 404, 406 (1974).

*Lewis,* 591 Pa. at 497–498, 919 A.2d at 926.

Contrary to the majority, I believe Dr. Senter's subjective testimony was insufficient "medical proof" to establish a "change" in Claimant's physical condition.

Here, Dr. Senter never testified that Claimant's physical condition (which included severe compression of the eighth cranial nerves) changed since the last adjudication. Dr. Senter merely concluded, based on inconsistent responses during a physical examination, that Claimant was "malingering" and "faking" his symptoms. I submit this was insufficient to meet Employer's burden to prove Claimant's physical condition changed or that he fully recovered from the severe compression of his eighth cranial nerves. Despite the lack of any *objective* medical evidence that Claimant's physical condition changed since the last adjudication, the majority has essentially allowed Employer to meet its burden by simply offering Dr. Senter's opinion that the Claimant was faking his

symptoms which I submit is in direct contravention to the Supreme Court's holding in *Lewis*.

The WCJ also based his decision, in part, on the testimony of Dr. Talbot who, like Dr. Senter, never testified that Claimant's physical condition changed from the WCJ's most recent prior adjudication of disability. In fact, Dr. Talbot did not believe that Claimant's disequilibrium and cranial nerve surgeries were related to the work injuries, despite the original adjudication that the surgeries were work related. He also based his opinion on the erroneous belief that Dr. Wapenski "did not find any nystagmus" that would "correlate with the complaint of dizziness" [7], when, in fact, Dr. Wapenski *did* find nystagmus "on the left lateral gaze." Dr. Wapenski Deposition at 10. Accordingly, I believe, contrary to the majority, that this case indeed falls squarely under *Wagman*. Because Dr. Talbot did not believe Claimant suffered compression of his eighth cranial nerves (Deposition of Dr. Talbot at 25) and he never testified that Claimant recovered from the accepted work injury, the WCJ erred by relying on this testimony to terminate benefits. Critically the outcome espoused by the majority will invite unending litigation, all that will be required is a physician to opine that claimant was "faking."

I would reverse.

Judge SMITH–RIBNER and Judge PELLEGRINI join in this dissent.

---

7. Dr. Talbot Deposition at 21.