# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Marriott International, Inc., : 
                Petitioner : 
                 : 
           v. :   No. 43 C.D. 2023
                 :   Argued: December 4, 2023
Renee C. Loguidice (Workers' : 
Compensation Appeal Board), : 
              Respondent : 

BEFORE:    **HONORABLE RENÉE COHN JUBELIRER,** President Judge
             **HONORABLE CHRISTINE FIZZANO CANNON,** Judge
             **HONORABLE ELLEN CEISLER,** Judge

<u>**OPINION NOT REPORTED**</u>

**MEMORANDUM OPINION BY**
**PRESIDENT JUDGE COHN JUBELIRER**         **FILED: January 3, 2024**

Marriott International, Inc. (Employer) petitions for review of the December 22, 2022 Order of the Workers' Compensation Appeal Board (Board) reversing a decision of Workers' Compensation Judge Audrey Beach (WCJ Beach) that granted Employer's second Petition to Terminate (Second Termination Petition) Renee C. Loguidice's (Claimant) workers' compensation (WC) benefits. On appeal, Employer argues the Board erred in finding Employer's expert's testimony not legally competent and that Employer did not meet its burden of proof based on the Board's misinterpretation of the standard of proof required for an employer to terminate a claimant's benefits after a prior termination petition is denied as described in *Lewis v. Workers' Compensation Appeal Board (Giles & Ransome, Inc.)*, 919 A.2d 922 (Pa. 2007), and *Delaware County v. Workers' Compensation Appeal Board (Browne)*, 964 A.2d 29 (Pa. Cmwlth. 2008). In *Lewis*, our Supreme Court held that where there have been prior petitions to modify or terminate benefits,

the employer must demonstrate an actual change in physical condition since the last disability determination, 919 A.2d at 926, and in *Browne*, this Court held that an employer's expert must accept and address, in their opinions of full recovery, the injuries adjudicated previously as work related, 964 A.2d at 36-37. Upon review, we reverse because when Employer's expert's testimony as a whole and WCJ Beach's credibility determinations are considered, the Board erred in finding that Employer's expert's testimony was not legally competent, and that Employer had not met its burden of proof on the Second Termination Petition.

## I.  BACKGROUND

This Court previously set forth the factual and procedural background in this matter in a memorandum opinion denying Employer's request for supersedeas as follows.

> On February 4, 2018, Claimant, a bartender, tripped and fell at work, and Employer accepted an upper back injury pursuant to a Notice of Temporary Compensation Payable that converted by operation of law. On September 27, 2018, Employer filed Termination and Suspension Petitions, to which Claimant filed answers denying the allegations therein. Thereafter, Claimant filed a Petition to Review Benefits (Petition to Review) seeking to expand the description of her work injury. On November 25, 2019, WCJ Nancy Farese [(WCJ Farese)] granted the Petition to Review and expanded the description of Claimant's work-related injuries to include an aggravation and exacerbation of preexisting lumbago and post-traumatic lumbar radiculopathy. ( . . . WCJ Farese Decision 11/25/2019 (WCJ Farese Decision) at 10.) WCJ Farese denied the Termination and Suspension Petitions, concluding, respectively, that Employer had not proven that Claimant had recovered from the aggravation and exacerbation of preexisting lumbago and lumbar radiculopathy[3] or that a job was available to Claimant within her physical abilities. (*Id*. at 8, 10.)
>
> > [3] WCJ Farese did conclude that Claimant had recovered from a lumbar strain and sprain and, therefore, granted the

2

Termination Petition in that respect. (WCJ Farese Decision at 8, 10.)

On March 20, 2020, Employer filed a second Termination Petition, which was assigned to WCJ Beach. In support of its claim, Employer submitted into evidence video surveillance of Claimant taken at a beach in New Jersey on June 14, and 18, 2019, along with the deposition testimony of Richard Meagher, M.D. Dr. Meagher conducted an independent medical examination (IME) of Claimant on January 14, 2020. ( . . . WCJ Beach Decision 5/20/2021 (WCJ Beach Decision), Findings of Fact (FOF) ¶¶ 6, 9.)

During his examination of Claimant, Dr[.] Meagher found no showing of muscle atrophy or muscle weakening which would be expected if Claimant had ongoing lumbar radiculopathy. (WCJ Beach Decision, FOF ¶ 6.) He also found no evidence of spasm in her low back. (*Id.*) Claimant gave a significant pain reaction to gentle touching, and Dr. Meagher believed Claimant was malingering and not providing genuine responses or effort during the examination. (*Id.*) Dr. Meagher stated Claimant's February 28, 2018[] lumbar magnetic resonance imaging (MRI) "revealed a central herniation at L4-5 and post-surgical changes at L5-S1" from Claimant's prior surgery for sciatic pain.[4] (*Id.*) A second lumbar MRI, conducted April 13, 2018, revealed similar findings. (*Id.*) Claimant's 2018 electromyography study (EMG) and nerve conduction study showed an S1 radiculopathy on the left side, which was consistent with post-surgical changes from Claimant's previous lumbar surgery for sciatic pain. (*Id.*)

[4] Claimant underwent surgery in 2006, "during which an L5-S1 extruded disc was removed and a left L5-S1 hemilaminectomy was performed." (WCJ Beach Decision, FOF ¶ 10.)

In 2020, following his review of the MRI films, Dr. Meagher updated his findings to include "a small disc protrusion at L4-5[,] without any significant aspect of neural elements." (*Id.* (internal quotation marks omitted).) Dr. Meagher stated this "finding was not consistent with an active radiculopathy." (*Id.*) He opined that the EMG and nerve conduction study of August 8, 2018, "was consistent with an S-1 radiculopathy on the left, which was also consistent with post-surgical changes from the previous [] Claimant's lumbar surgery." (*Id.*) He opined that there were no radiographic findings that explained Claimant's subjective complaints of pain. (*Id.*)

3

Dr. Meagher also reviewed the surveillance video of Claimant. He found that surveillance video showed Claimant moving seemingly without pain and doing activities inconsistent with someone who suffered from radiculopathy, such as, walking for blocks, up inclines, and up and down steps. (*Id.*) Following his review, Dr. Meagher concluded that Claimant had fully recovered from her work-related injuries and was fully capable of resuming her pre[-]injury job without restriction. (*Id.*)

Claimant testified both by deposition and before WCJ Beach as follows. She contended that her low back pain and leg pain continued, in fact, the pain was getting worse. (*Id.*, FOF ¶ 5.) Her leg pain was significant, it involved the circumference of both legs. (*Id.*) She could only drive 5 miles at a time and remain in a vehicle as a passenger for approximately 30 minutes. (*Id.*) Claimant had a heart attack in 2018, after which she stopped smoking. (*Id.*, FOF ¶ 12.) In 2020, she was hospitalized for 34 days following a heart valve replacement, contracted pneumonia, and was placed on a ventilator. (*Id.*, FOF ¶ 5.) Claimant stated her back pain increased during her lengthy hospitalization. She had consulted with a surgeon regarding her ongoing back pain, but surgery has not yet been scheduled. (*Id.*) Claimant did not review the surveillance video of her activities at the beach, but explained she traveled to the beach two or three times a year. (*Id.*) She stated that after the trip, she suffered with pain and was in bed practically an entire day. (*Id.*)

Claimant submitted the deposition testimony of Uplekh Purewal, M.D., her treating physician. He diagnosed Claimant with preexisting lumbago, which the work injury aggravated and exacerbated, and post-traumatic lumbar radiculopathy and stated her symptoms had not changed significantly with treatment. (*Id.*, FOF ¶ 10.) Claimant's low back pain averaged an 8 on a scale of 1 to 10. (*Id.*) Claimant had leg pain that she described "as sharp, aching, and burning." (*Id.*) Claimant could only walk for several minutes before her leg pain became severe. (*Id.*) Thus, Dr. Purewal opined that Claimant was not fully recovered from her work injuries. (*Id.*) Dr. Purewal did address Claimant's lengthy hospitalization, stating that it would not have increased her back pain because "being in a supine position would lead to a significant decrease in [] pain." (*Id.*) He did not review the video surveillance evidence. (*Id.*)

WCJ Beach rejected Claimant's testimony as not credible. (*Id.*, FOF ¶ 12.) WCJ Beach noted inconsistencies between Claimant's testimony

4

and the surveillance video of her at the beach. For example, Claimant had testified that she stopped smoking in 2018, but was clearly smoking in the 2019 video. Claimant also testified she could only walk for a few minutes without pain, but was active for hours on the video, "strolling the boardwalk" in flip-flops. (*Id.*) Additionally, Claimant's testimony that her back pain increased while hospitalized contradicted Dr. Purewal's opinion that the extended amount of time Claimant was in a supine position should have decreased her pain. (*Id.*)

WCJ Beach rejected Dr. Purewal's testimony primarily because Claimant's testimony was deemed unworthy of belief. (*Id.*, FOF ¶ 13.) WCJ Beach found Dr. Meagher's testimony credible. (*Id.*, FOF ¶ 11.) Dr. Meagher's testimony was "consistent with [] Claimant's abilities" as documented in the surveillance video, her nonphysiologic complaints during the IME, and her "pre[]existing non-work-related L5-S1 herniated disc with subsequent surgical repair in 2006." (*Id.*) Based on her findings, WCJ Beach held that Employer sustained its burden of proving that Claimant was fully recovered from her work injuries as of January 14, 2020, and granted Employer's Termination Petition. Claimant appealed to the Board.

The Board reversed, citing *Lewis* . . . and . . . []*Browne*[] . . . for the proposition that to terminate benefits, an employer whose termination petition was previously denied must show an actual change in the claimant's physical condition since the last disability determination. Moreover, the employer's medical expert must accept that the previously adjudicated injuries are, in fact, work[ ]related. [*Browne*], 964 A.2d at 35. The Board explained that "Dr. Meagher found an objective symptom of radiculopathy but attributed that symptom to a previous surgery, not active radiculopathy[,] based on the EMG from the previous Termination Petition[.]" ( . . . Board Opinion 12/22/2022 (Board Op.) at 11.)[5] However, in the first termination proceeding, WCJ Farese had found Dr. Purewal to be credible and persuasive that Claimant sustained an aggravation and exacerbation of her preexisting lumbago and post-traumatic lumbar radiculopathy based, in part, on that same EMG. (WCJ Farese Decision, FOF ¶¶ 3m, 3ii, 9.) Thus, to show an actual change of condition, the Board held Dr. Meagher was required to assume that the radiculopathy was work-related. Instead, he "use[d] diagnostic studies that pre-dated the previous termination in contravention of *Lewis* and [*Browne*]" and "based his opinions on facts that had already been adjudicated" to the contrary of his opinion by WCJ Farese, rendering Dr. Meagher's testimony not competent.

5

(Board Op. at 11-12.)  As such, the Board reversed WCJ Beach's grant of the Termination Petition.[6]

> [5] The August 8, 2018, EMG report was submitted into evidence at the first termination proceeding.  (WCJ Farese Decision, FOF ¶ 3.)
>
> [6] Commissioner William Gabig concurred in the result only, and two Board members dissented.  In his dissent, Board Chairman[,] Alfonso Frioni, Jr., stated that the majority's application of *Lewis* was misplaced because WCJ Beach "ruled on objective findings and credibility." (Board Op. at 14.)  Further, in the [S]econd Termination Petition, filed 18 months later, Dr. Meagher testified that Claimant had no atrophy, compared the two MRIs, and reviewed new video surveillance evidence.  (*Id.*)

*Marriott Int'l, Inc. v. Loguidice (Workers' Comp. Appeal Bd.)* (Pa. Cmwlth., No. 43 C.D. 2023, filed June 16, 2023).  Chairman Frioni reasoned Employer met its burden of proof on the Second Termination Petition pursuant to *Baumann v. Workers' Compensation Appeal Board (Kellogg Co.)*, 147 A.3d 1283 (Pa. Cmwlth. 2016), and *Folmer v. Workers' Compensation Appeal Board (Swift Transportation)*, 958 A.2d 1137 (Pa. Cmwlth. 2008).  (Board Op. at 14.)  Employer now petitions for review of the Board's Order.[1]

## II.    DISCUSSION

At issue is whether Employer met its burden of proof on the Second Termination Petition, a burden that differs from that on its initial Termination Petition.  A majority of the Board concluded that Employer did not do so because Dr. Meagher's opinion was not competent pursuant to *Lewis* and *Browne* where Dr.

---

[1] This Court's scope of review "is limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated."  *Elberson v. Workers' Comp. Appeal Bd. (Elwyn, Inc.)*, 936 A.2d 1195, 1198 n.2 (Pa. Cmwlth. 2007).

6

Meagher attributed an objective finding of ongoing radiculopathy not to the work injury, but to a pre-injury surgery, based on his review of an EMG that predated the initial termination proceeding.

Employer challenges this determination, arguing the Board exceeded its authority by reweighing the evidence and not viewing the evidence in the light most favorable to Employer, the prevailing party before WCJ Beach. Employer maintains the Board did not view Dr. Meagher's testimony as a whole but focused on one statement that the Board then misinterpreted to mean that Dr. Meagher rejected the diagnosis of work-related radiculopathy. When the record is viewed in its entirety, Employer asserts, it reflects that Dr. Meagher accepted the judicially determined work injuries, distinguishing this matter from *Lewis* and *Browne*, and based his opinion of full recovery from those injuries on his **physical examination** of Claimant, which was then confirmed by the **surveillance video** reflecting Claimant engaged in activities inconsistent with ongoing radiculopathy. Employer further argues that, pursuant to *Baumann* and *Folmer*, the change of physical condition necessary to meet the requirements of *Lewis* can be based on a WCJ finding, as WCJ Beach did here, that the claimant's complaints of ongoing pain were not credible, a finding that falls within the exclusive purview of the WCJ's role as factfinder. Here, Employer maintains, WCJ Beach credited Dr. Meagher's opinion of full recovery while discrediting Claimant's ongoing complaints of pain, and, together, these reflect a change in Claimant's physical condition sufficient to support the grant of the Second Termination Petition.

Claimant argues the Board properly held that Dr. Meagher's testimony was not legally competent to support the grant of the Second Termination Petition. Claimant asserts that no error occurred because Dr. Meagher not only relied on

medical evidence used in the initial termination proceeding, the EMG and MRI results, but also opined that the EMG results did not show evidence of active radiculopathy and were consistent with the pre-injury surgery, opinions that contradicted WCJ Farese's findings. According to Claimant, Dr. Meagher's testimony effectively challenged the diagnosis as determined by WCJ Farese, which is insufficient under *Lewis* and improper under *Browne*. To find Dr. Meagher's testimony competent to support the grant of the Second Termination Petition, Claimant asserts, would allow Employer to engage in the prohibited process of filing serial termination petitions based on the same evidence in hopes of obtaining a different result. Claimant argues that because Dr. Meagher's testimony was not legally competent, Employer could not meet its burden of proof under *Lewis*.

Section 413(a) of the Workers' Compensation Act[2] (Act) authorizes WCJs to, "at any time, . . . terminate a notice of compensation payable . . . **upon proof that the disability of an injured employe has** increased, decreased, recurred, or has **temporarily or finally ceased** . . . ." 77 P.S. § 772 (emphasis added). To prevail

> [o]n a termination petition, an employer bears the burden of proving by substantial evidence that a claimant's disability ceased, or any remaining conditions are unrelated to the work injury. An employer may satisfy this burden by presenting unequivocal and competent medical evidence of [a] claimant's full recovery from [the] work-related injuries.

*Westmoreland County v. Workers' Comp. Appeal Bd. (Fuller)*, 942 A.2d 213, 217 (Pa. Cmwlth. 2008) (citations omitted). "[W]here [a] claimant complains of continued pain," an employer meets its burden when an employer's medical expert unequivocally testifies to the above, and "that there are no objective medical findings

---

[2] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 772.

8

which either substantiate the claims of pain or connect them to the work injury." *Udvari v. Workmen's Comp. Appeal Bd. (USAir, Inc.)*, 705 A.2d 1290, 1293 (Pa. 1997). "The determination of whether a claimant's subjective complaints of pain are accepted is a question of fact for the WCJ."[3] *Id.* Contrarily, the legal competency of an expert witness's testimony is a question of law, subject to this Court's de novo review. *Sarmiento-Hernandez v. Workers' Comp. Appeal Bd. (Ace Am. Ins. Co.)*, 179 A.3d 105, 111 n.7 (Pa. Cmwlth. 2018). To be competent to support the termination of WC benefits, a medical expert must recognize the claimant's accepted work-related injury and unequivocally opine that the claimant has fully recovered from those injuries. *Id.* at 110. In deciding whether a medical expert's testimony is legally competent, it must be considered as a whole, and a court may not base its analysis on a few words taken out of context. *Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 80 (Pa. Cmwlth. 2012).

In *Lewis*, relied upon by Claimant and a majority of the Board, our Supreme Court examined an employer's burden of proof when litigating a termination petition after the denial of a prior termination petition. The issue, in *Lewis*, was "whether an employer must demonstrate a change in a claimant's physical condition since the preceding disability adjudication in order to bring a petition to terminate or modify benefits due to a decrease in physical disability." 919 A.2d at 925. That Court held that

> [i]n order to terminate benefits on the theory that a claimant's disability has reduced or ceased due to an improvement of physical ability, it is

---

[3] It is well settled that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). For this reason, the WCJ may "accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000).

9

first **necessary that the employer's petition be based upon medical proof of a change in the claimant's physical condition**. Only then can the [WCJ] determine whether the change in physical condition has effectuated a change in the claimant's disability, i.e., the loss of [the claimant's] earning power. Further, **by natural extension[,] it is necessary that, where there have been prior petitions to modify or terminate benefits, the employer must demonstrate a change in physical condition since the last disability determination**. Absent this requirement "a disgruntled employer (or claimant) could repeatedly attack what [it] considers an erroneous decision of a [WCJ] by filing petitions based on the same evidence ad infinitum, in the hope that one [WCJ] would finally decide in [its] favor." *Dillon v. Workmen's Comp. Appeal Bd. (Greenwich Collieries)*, 640 A.2d 386, 389 (Pa. 1994) . . . .

Once an employer sets forth the change in physical condition required to properly bring a petition to terminate benefits, it still bears a high burden. Disability is presumed until demonstrated otherwise[,] and it is the employer's burden to prove that "all disability related to a compensable injury has ceased." *Pieper v. Ametek-Thermox Instruments Div*[.], . . . 584 A.2d 301, 304 ([Pa.] 1990).

*Lewis*, 919 A.2d at 925-26 (emphasis added). A claimant's physical "'[c]ondition' is not merely the claimant's underlying diagnosis, but any change in the claimant's physical wellbeing affecting [the claimant's] ability to work," which could "be the total recovery from an illness or merely that the symptoms subside." *Id.* at 926-27. "In order to meet its burden . . . an employer need only adduce medical evidence that [a] claimant's current physical condition is different than it was at the time of the last disability adjudication." *Id.* at 928. It is neither sufficient nor "proper[] for an employer merely to challenge the diagnosis of [a] claimant's injuries as determined by a prior proceeding." *Id.* Thus, an employer's expert must address the injuries that have been accepted and/or adjudicated to be work related and opine that the claimant has fully recovered therefrom. *Id.* at 929. Applying this standard in *Lewis*, the Supreme Court concluded that the testimony of employer's expert, who acknowledged no physical change in the claimant but attempted to recharacterize

10

the claimant's adjudicated work-related injuries and symptoms to non-work-related causes, did not support the grant of the subsequent termination petition.

A little over a year after *Lewis*, this Court issued its decision in *Browne*, discussing the contours of *Lewis*. Therein, we explained that

> If an employer comes forward with **credible medical evidence** that the **claimant's current physical condition is different** than it was at the time of the last disability adjudication **due to total recovery** from the recognized work[ ]injury, **such medical evidence would satisfy the employer's burden of proving a change in the claimant's physical condition**. In other words, by accepting the employer's medical evidence of full recovery as credible, a WCJ could properly make a finding that the employer has met the standard set forth in *Lewis* by demonstrating a change in [the c]laimant's condition. However, as this Court recently held in *Prebish v. Workers' Compensation Appeal Board (DPW/Western Church)*, 954 A.2d 677 (Pa. Cmwlth. 2008), the WCJ must make that factual finding.

*Browne*, 964 A.2d at 35 (emphasis added). Accordingly, we held in *Browne*, that an employer's subsequent termination case must "begin with the adjudicated facts found by the WCJ in the first termination [case] and work forward in time to show the required change." *Id.* at 36 (citation omitted). In this regard, the subsequent termination decision may not issue findings inconsistent with the first, for example, by finding that a condition previously adjudicated as work related had a non-work-related origin. *Id.* Nor can the expert opining full recovery base the opinion, in part, "on medical records, diagnostic tests, and physical examinations that pre[]date [the e]mployer's allegation of full recovery as of [the date] in its first termination petition." *Id.* Because the WCJ's decision in *Browne* predated *Lewis*, the WCJ did not make any findings of a change of physical condition, made findings that conflicted with the previously adjudicated injuries, and credited the testimony of the employer's expert who questioned whether the adjudicated injuries were work

11

related and had relied on past diagnostic testing to issue the second opinion of full recovery. *Id.* at 36-37. Therefore, we remanded for the WCJ to reconsider the record in light of *Lewis*.

Employer argues that Dr. Meagher recognized the injuries adjudicated to be work related, as required by *Lewis* and *Browne*, and, therefore, the Board erred in finding his opinion of full recovery not legally competent. After reviewing Dr. Meagher's testimony as a whole, we agree. The following exchanges occurred regarding the scope of Claimant's work injuries and the current status of those injuries.

> Q. Doctor, [Claimant] was about two years out from the work injury at the time you examined her, and **her compensable diagnosis has been judicially established to include a post-traumatic lumbar radiculopathy**. How would you expect that to manifest on physical examination if it was still an ongoing condition?
>
> A. Well, there might be some sign of muscle atrophy or genuine muscle weakness. There might be a sensory deficit that adheres to a dermatomal pattern or at least resembles a dermatomal pattern. There might be some reflex asymmetry. As I stated earlier, she had a decreased left Achilles reflex, but that was certainly in keeping with the discectomy she had had at L5-S1 years earlier.
>
> Q. Did she have any of the hallmarks, atrophy or motor weakness or decreased strength, that you would anticipate to see in an active, ongoing radicular condition?
>
> A. No.
>
> Q. How would you characterize the physical examination?
>
> A. I concluded that she was malingering. She was just outright not providing any genuine response or effort.
>
> Q. Did you have medical records available for your review as well as [WCJ] Farese's . . . decision?

A. Yes, I did, and a summary of those records are outlined in my report.

Q. What, to your mind when you were seeing her in January of 20[20],[4] was most significant in the records that you did review?

A. Well, there were MRIs of the lumbar spine that had been performed on February 28, 2018[,] that was described as revealing a central herniation at L4-5. The radiologist noted post-surgical changes at L5-S1.

There was a subsequent lumbar MRI dated April 13th of 2018[,] . . . the findings of which were described similar to the previous study. I thought it was interesting in an IME report that Dr. [Scott] Rushton had authored that he reviewed the MRI and did not observe a disc herniation at that level.

[Claimant] claimed that her pain was ongoing despite all of her treatment, yet that treatment continued. That alone at some point doesn't make much sense.

The EMG and nerve conduction study she had on August 8th of 2018[,] was consistent with an S1 radiculopathy on the left, but also again very consistent with post-surgical change from her previous lumbar surgery.

Q. Did you at the time of your examination on January 14th, 2020[,] have the actual MRI films?

A. At that time, I did not, and so I reserved my determination on whether she had completely recovered from her work injury until I had seen that.

But going back to the records, I also thought it was interesting that some of her treating physicians considered her fully capable of work. . . .

Q. So understanding that we're asking for your opinions as of January of 2020, what were your impressions pending review of the MRI films?

A. Well, I certainly consider her fully capable of resuming her formal occupation. I could determine that based on the descriptions of her films and based on the evident symptom magnification or

_____

[4] The transcript indicates that Dr. Meagher testified "January of 2000," but this is obviously a misstatement as he examined Claimant on January 14, 2020. (Reproduced Record (R.R.) at 61a.)

embellishment during her examination, that her complaints of pain were clearly out of proportion to the results of her diagnostic tests and in and of themselves were non-physiologic in nature.

Q. And did you have the opportunity to see the post-injury MRI of her lower back?

A. I did, and I issued an addendum dated March 14th of 2020.

Q. And in that addendum, how do you interpret the film . . . ?

A. The MRI of the lumbar spine revealed a small disc protrusion at L4-5, without any significant aspect of the neural elements. Certainly not something consistent with an active radiculopathy. There were post-surgical changes noted at L5-S1 on the left, consistent with her previous surgery.

But the bottom line was there were no radiographic findings that provided an adequate explanation for her complaints.

Q. Okay. So, Doctor, **you did have the opportunity to review [WCJ] Farese's decision from 2019**?

A. **Yes**.

Q. And for the purposes of your opinion, **did you accept her determined diagnoses of exacerbation/aggravation of lumbago and post-traumatic radiculopathy**?

A. **Yes**. I didn't have the opportunity to evaluate [Claimant] until January 14th of 2020.

Q. **So as of that day on January 14th, 2020, accepting those judicially determined diagnoses**, did you have an opinion within a reasonable degree of medical certainty whether she had fully recovered from those injuries that were attributable to February 4th, 2018?

A. Yes, or at least at the time I had the chance to evaluate her MRI and for the sake of being thorough and evaluating her diagnostic studies myself, by that time, I considered her fully recovered.

Q. And what, apart from the MRI, was supportive of that opinion on physical exam?

A. Well, her physical – there was no objective evidence of any disability or any active radiculopathy. For that matter, of any genuine lumbago.

Q. Any evidence of spasm in the low back?

A. There was no spasm. Her range of motion testing was clearly insincere.

. . . .

Q. Doctor, did you have the opportunity . . . subsequent to issuing your IME report and your addendum report, to view surveillance of [Claimant] from June of 2019.

A. Yes, I did.

Q. And what did you review?

A. I reviewed video surveillance . . . [in which Claimant] was videotaped walking full city blocks on multiple occasions, walking up inclines, going up and down steps. There was never any manifestation of pain. . . .

Q. And, Doctor, understanding again that we're not seeking a termination of [Claimant's] benefits until January 14th of 2020, but how, if at all, does seeing this video . . . support or impact the opinion that you ultimately rendered?

A. It was certainly in keeping with the opinions that I ultimately rendered.

Q. Was there any indication on that video surveillance of manifestation of radiculopathy?

A. No.

Q. How would you expect somebody with a radicular problem for their gait to manifest?

A. There might be frequent interruption of gait. I think many patients might look for handicapped access points. There might be some evidence of grimacing or halting of behavior?

15

Q. And did you see any of that?

A. No.

(Reproduced Record (R.R.) at 60a-68a (emphasis added).)

On cross-examination, Dr. Meagher confirmed his acceptance of the judicially determined diagnoses, as well as that his full recovery opinion was based on his physical examination and confirmed by the video surveillance.

Q. Now, in hearing you review some of the medical records dating back to 2018, **I have to ask, do you disagree or question the judicially determined diagnosis here**?

A. **No**. No. I simply pointed out there were some discord between care providers.

Q. Okay, Doctor. And essentially I get the feel[ing] from your direct examination there's a credibility symptom magnification issue here with you for [C]laimant; am I correct?

A. Absolutely.

Q. Okay. You did say that you did review the decision of [WCJ] Farese . . . did you not?

A. Yes, I did.

Q. And I know your opinion is your opinion, but you did review that at least [WCJ Farese] had the [C]laimant credible within her presentation, at least in [WCJ Farese's] decision?

A. Yes.

Q. And did that impact whether or not you found her pain complaints credible or not?

A. No. Again, I based my opinions on my evaluation of January 14th, 2020.

(*Id.* at 71a-72a (emphasis added).)

Apparent from the above testimony is that Dr. Meagher was asked multiple times about WCJ Farese's decision and/or the adjudicated injuries, which he accepted, but that his physical examination of Claimant did not support active radiculopathy or aggravation/exacerbation of lumbago. He further testified that his opinion of full recovery from those injuries was confirmed by the surveillance video of Claimant, among other things, walking city blocks and climbing steps multiple times without any apparent signs of pain or difficulty that he would anticipate someone suffering from active radiculopathy would demonstrate. When asked about his review of the 2018 medical reports and whether they caused him to disagree with the adjudicated injuries, Dr. Meagher explained that he did not disagree and that he was simply pointing out "discord" by the prior providers.

In making its contrary legal determination, the Board focused on Dr. Meagher's testimony that referenced reflex asymmetry as being a manifestation of ongoing radiculopathy but noted that Claimant "**had a decreased left Achilles reflex, but that was certainly in keeping with the discectomy she had had at L5-S1 years earlier**." (R.R. at 60a-61a (emphasis added).) The Board reasoned that Dr. Meagher's attribution of Claimant's "decreased left Achilles reflex" to a pre-injury surgery, (*id.* at 61a), rather than the adjudicated radiculopathy, meant he did not accept the adjudicated work-related radiculopathy in contravention of *Lewis* and *Browne*.

We agree with Employer, however, that the Board viewed this statement in isolation, rather than within the context of Dr. Meagher's entire testimony. Both *Lewis* and *Browne* involved experts who plainly did not accept the adjudicated injuries but sought to rediagnose or recharacterize the cause of the claimants'

17

injuries.  *Lewis*, 919 A.2d at 929 (expert conceded the claimant was in the same condition and had the same medical conditions as the prior termination proceeding but tried to recharacterize the cause of those conditions as not work related); *Browne*, 964 A.2d at 36 (expert repeatedly questioned the work-relatedness of the claimant's injuries notwithstanding that an earlier adjudication found them to be work related).  Unlike *Lewis* and *Browne*, Dr. Meagher's **entire** testimony reflects that he did not dispute or disagree with Claimant's adjudicated injuries, but opined, based on his physical examination of January 14, 2020, and his belief that Claimant's responses during that physical exam were incredible, that Claimant had fully recovered because she did not have the hallmark symptoms of ongoing radiculopathy or an aggravation/exacerbation of lumbago, which was confirmed by the surveillance video.  And, unlike the employer's expert in *Lewis*, Dr. Meagher did not concede that Claimant was in the same physical condition as she was in the prior proceeding.  The legal competency of an expert witness's testimony must be determined by reviewing the **entire testimony**, not a single sentence taken out of context, *Amandeo*, 37 A.3d at 80, and, when this is done here, we conclude, as a matter of law, that Dr. Meagher accepted the adjudicated work injuries and unequivocally opined that Claimant was fully recovered therefrom.  Accordingly, that testimony is legally competent, and the Board erred in finding otherwise on this basis.

Employer also argues that the Board erred in finding Dr. Meagher's testimony not legally competent because he considered diagnostic testing that predated the initial termination proceeding in contravention of *Browne* and that this matter is like *Baumann*, a case unaddressed by Claimant.  Although we indicated in *Browne* that an expert opinion of full recovery could not be based on diagnostic tests that had predated a prior attempt to terminate WC benefits, we subsequently held in

*Baumann*, cited by Chairman Frioni, that while a "WCJ's finding **cannot** be based **solely** upon evidence that pre[ ]dates the previous adjudication, . . . it *may be based upon a review of such evidence **plus** a post-adjudication examination*." 147 A.3d at 1291 (bold emphasis added).

In *Baumann*, a WCJ denied a termination petition, and, thereafter, the employer filed a second termination petition based on a new physical examination of the claimant by its expert. In opining that the claimant had fully recovered from the work injuries, the employer's expert reviewed the claimant's prior EMG and MRIs and medical records, including those that preceded the prior termination determination. *Id.* at 1286-87. The claimant argued the employer had not met its burden of proving a change in medical condition; we disagreed, stating

> [c]ertainly, the "doctor's [credited] diagnosis and opinion of work ability . . . supported by other evidence of record, namely [the c]laimant's activities and the WCJ's personal observation of [the c]laimant . . . which suggested that [the c]laimant's subjective complaints were either not accurate, not as severe as described or had improved since the last proceeding[,]" are sufficient to establish a change in [the c]laimant's condition such that the *Lewis* requirement is met. *Simmons* [*v. Workers' Comp. Appeal Bd. (Powertrack Int'l)*], 96 A.3d [1143,] 1149 [(Pa. Cmwlth. 2014)]. The fact that [the employer's expert] rendered the same opinion after [the c]laimant's May 2010 IME as he did following [the c]laimant's January 2009 IME does not invalidate the latter opinion, particularly when the WCJ's finding was based upon [the employer's expert's] credited medical opinion and [the c]laimant's testimony of his activities since the 2009 [t]ermination [p]etition was denied.

*Baumann*, 147 A.3d at 1293. As in *Baumann*, Dr. Meagher's credited opinion of full recovery, based on his "post-adjudication examination" of Claimant, *id.* at 1291, was supported by Claimant's activities reflected in the video surveillance and WCJ Beach's rejection of Claimant's testimony, including her complaints of pain and

inability to walk for more than a few minutes due to her work injuries, "as not worthy of belief." (WCJ Beach Decision, FOF ¶ 12.) Therefore, WCJ Beach's findings are not based "solely upon evidence that predates the previous adjudication," *Baumann*, 147 A.3d at 1291, and this was not a reason to find Dr. Meagher's testimony insufficient to support terminating Claimant's benefits.

Employer further argues that *Folmer*, also cited by Chairman Frioni and unaddressed by Claimant, supports the WCJ's conclusion that Employer met its burden of proof under *Lewis*. In *Folmer*, the claimant's symptoms related to his work injury were primarily subjective in nature, and he argued that an employer's ability to show the change in his condition required in a subsequent termination petition was limited.[5] We rejected the claimant's arguments, reasoning that they would impermissibly "impinge upon the province of the WCJ, who has the statutory responsibility to consider the evidence; determine which evidence is credible; and decide which evidence is entitled to the greatest weight." *Folmer*, 958 A.2d at 1144. Ultimately, we held that based on the WCJ's rejection of the claimant's evidence in the second proceeding, the employer met its burden of proving "a change in physical condition, as required by *Lewis*," because "[i]n the first termination proceeding[,] [the c]laimant was found to be suffering pain, and in the second proceeding he was found to be free of pain." *Id.* at 1145. Similarly, here, while WCJ Farese credited Claimant's complaints of ongoing pain and symptoms due to the post-traumatic radiculopathy and aggravation of Claimant's preexisting lumbago found to be work related in the initial termination proceedings, WCJ Beach rejected Claimant's

---

[5] Notably, the claimant argued that an employer could "show a change in the claimant's condition" by presenting "surveillance videotapes show[ing] the claimant engaging in activities beyond his abilities given his work injury." *Folmer*, 958 A.2d at 1144. This was one way that Employer here showed a change in Claimant's physical condition.

testimony regarding the same, provided multiple reasons supported by the record for that determination, and credited Dr. Meagher's testimony that any pain Claimant allegedly experienced during the physical examination was incredible. Accordingly, *Folmer* supports the conclusion that Employer met its burden of proving "a change in physical condition, as required by *Lewis*." *Id.*

## III. CONCLUSION

In sum, we agree with Employer and the Board dissenters that this matter is more akin to *Baumann* and *Folmer* than to *Lewis* and *Browne*. Here, Dr. Meagher accepted the adjudicated work injuries and opined that Claimant was fully recovered from those work injuries. For the reasons set forth above, this opinion is legally competent and, as it was found credible by WCJ Beach, "satisf[ies] . . . [E]mployer's burden of proving a change in [] [C]laimant's physical condition." *Browne*, 964 A.2d at 35. Accordingly, we reverse the Board's Order.

_____
**RENÉE COHN JUBELIRER,** President Judge

Judge Covey and Judge Dumas did not participate in the consideration of this case.

21

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Marriott International, Inc.,        :
                     Petitioner      :
                                         :
             v.                     :    No. 43 C.D. 2023
                                         :
Renee C. Loguidice (Workers'     :
Compensation Appeal Board),      :
                     Respondent     :

## **O R D E R**

**NOW**, January 3, 2024, the December 22, 2022 Order of the Workers' Compensation Appeal Board, entered in the above-captioned matter, is **REVERSED**.

_____

**RENÉE COHN JUBELIRER,** President Judge
